NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY EDUCATION ASSOCIATION, et al.<br><br>   Plaintiffs,<br><br>v.<br><br>STATE OF NEW JERSEY, et al.<br><br>   Defendants. | Civ. No. 11-5024<br><br>OPINION |

THOMPSON, U.S.D.J.

  This matter has come before the Court on a Motion to Dismiss [Docket # 30] brought

pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) by Defendants Chris Christie, Governor of the

State of New Jersey, in his official and individual capacities ("Christie"); Andrew Sidamon-

Eristoff, Treasurer of the State of New Jersey, in his official and individual capacities

("Sidamon-Eristoff") (collectively, "the Executive Defendants"); and the State of New Jersey.

The Plaintiffs in this matter include numerous labor unions, union members, and related

organizations.  All Plaintiffs jointly oppose this motion [33].  The Court has decided this motion

after considering all of the parties' submissions and without oral arguments pursuant to Fed R.

Civ. P. 78(b).  For the reasons that follow, the pending motion will be granted.

  **I.  BACKGROUND**

  This case arises out of the enactment of Chapter 78 of Public Law 2011 ("Chapter 78"),

which made changes to the New Jersey State retirement system for public employees.  These

changes included, *inter alia*, an increase in employee contributions to certain state employee

pension funds and the suspension of Cost of Living Adjustments ("COLAs") to the monthly

retirement allowance/pension granted to both current and future retirees.  Plaintiffs allege that

these changes and others are unconstitutional because they impair pre-existing contracts, violate

the Due Process Clause, and constitute an unlawful taking without just compensation.  The

Plaintiffs bring suit for these claims under 42 U.S.C. § 1983.  Numerous forms of relief are

sought by Plaintiffs, including the following: (1) a declaration that certain portions of Chapter 78

violate the United States Constitution; (2) a permanent injunction against Defendants preventing

them from "administering, enforcing or otherwise implementing" portions of Chapter 78; (3) an

order directing Defendants "to commence immediately the full funding of [the disputed pension

funds]"; and (4) an order directing Defendants "to make Class Plaintiffs whole for any monetary

damages they have suffered as a result of the unlawful suspension of COLAs."  (Am. Compl.

55–56) [21].[1]

The Executive Defendants present four main arguments to the Court: (1) that the Court is

without subject matter jurisdiction because Plaintiffs' claims are barred by the Eleventh

Amendment; (2) Plaintiffs have no contractual right to any of the disputed items and therefore all

Contracts Clause claims must be dismissed; (3) all Due Process claims must be dismissed

because they cannot survive rational basis review; and (4) Plaintiffs' Takings Clause claims must

be dismissed because Plaintiffs have no protectable property interest in the disputed items.

## II.    ELEVENTH AMENDMENT

This Court has an independent duty to determine its own subject matter jurisdiction when

it is "fairly in doubt."  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1945 (2009) (citing

---

[1] In the Amended Complaint, Plaintiffs also allege that the changes enacted by Chapter 78 violate provisions of the
New Jersey State Constitution and that Defendants are liable for damages on a theory of promissory estoppel.  In
Plaintiffs' opposition brief to the pending motion, however, Plaintiffs have withdrawn their state-law claims against
all Defendants and they have also withdrawn all federal claims brought directly against the State of New Jersey.
(Pls.' Br. 1 n.1).  As such, those claims will be dismissed by the Court, and this Opinion will be limited to only those
issues relevant to the federal claims brought against the Executive Defendants.

*Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)); *see also Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003) (citations omitted).  Therefore, before addressing any of the substantive contentions raised by the Defendants concerning Plaintiffs' federal claims, this Court must first determine whether the Executive Defendants are protected by the Eleventh Amendment's grant of sovereign immunity.

Executive Defendants argue that Plaintiffs' claims are, in effect, nothing more than an action for money damages and therefore must be dismissed.  Plaintiffs, on the other hand, contend that their claims should be allowed to proceed based upon the United States Supreme Court's decision in *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny.[2]  After considering the arguments raised by both parties, the Court has determined that Plaintiffs' request for relief amounts to—both in substance and effect—a request for this Court to compel specific performance of a contract allegedly existing between Plaintiffs and the State of New Jersey[3] or otherwise compel the state to abide by its obligations in its "political capacity."  Because claims such as this are barred by the Eleventh Amendment, Plaintiffs' Amended Complaint must be dismissed.

### a. *Ex Parte Young* Exception

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of

---

[2] Plaintiffs further argue that the damages sought in this case will be paid from the reserves of the disputed pension funds, which are not arms of the state under United States Court of Appeals for the Third Circuit case law. Therefore, according to the Plaintiffs, their claims are not subject to sovereign immunity, at least as those damages relate to suspension of COLAs for retirees and increases in pension contributions by active members.  This argument, however, is a red-herring because the only remaining Defendants are Christie and Sidamon-Eristoff.  If Plaintiffs sought damages from the pension funds, these funds (or their boards) should have been named as Defendants.  The only issue before the Court is whether the Executive Defendants are protected by sovereign immunity, not whether the pension funds should be considered arms of the state for Eleventh Amendment purposes.
[3] Plaintiffs argue that the law in existence prior to enactment of Chapter 78 created a binding contract between Plaintiffs and the State.  The State denies that this pre-Chapter 78 legislation created a binding contract.  Although the Court does not decide this issue, it assumes for purposes of resolving this motion that a valid contract existed between the State and the Plaintiffs.

the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

U.S. CONST. AMEND. 11.  Although by its express terms this Amendment applies only to suits by

citizens of another state, it has long been established that the Eleventh Amendment also bars

suits against a state by one of its own citizens.  *See Hans v. Louisiana*, 134 U.S. 1, 20 (1890).

The Eleventh Amendment thus "confirm[s] the structural understanding that States entered the

Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant."  *Va.*

*Office of Prot. & Advocacy v. Stewart*, --- U.S. ---, 131 S. Ct. 1632, 1637 (2011) (citing

*Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991); *Pennhurst State Sch. and Hosp.*

*v. Halderman*, 465 U.S. 89, 98 (1984)).

There are several exceptions to the Eleventh Amendment's grant of sovereign immunity.

For example, States may consent to being sued in federal court, *see, e.g.*, *Atascadero State Hosp.*

*v. Scanlon*, 473 U.S. 234, 238 (1985), and Congress may abrogate state sovereign immunity

when legislating under section five of the Fourteenth Amendment, *see City of Boerne v. Flores*,

521 U.S. 507 (1997).  However, "[c]laims brought pursuant to 42 U.S.C. § 1983 are no exception

to Eleventh Amendment immunity."  *Lassoff v. New Jersey*, 414 F. Supp. 2d 483, 488 n.14

(D.N.J. 2007); *see also Quern v. Jordan*, 440 U.S. 332, 342 (1979).

The Eleventh Amendment exception relevant to this case arises from the Supreme

Court's decision in *Ex Parte Young*.  In *Ex Parte Young* the Supreme Court held that state

officials may be enjoined by a federal court from enforcing state laws that violate the United

States Constitution.  *Id.* at 155–56.  In such a case, "the officer is simply prohibited from doing

an act which he had no legal right to do."  *Id.* at 159.  Thus, "when a federal court commands a

state official to do nothing more than refrain from violating federal law, he is not the State for

sovereign-immunity purposes."  *Stewart*, 131 S. Ct. at 1638.

4

This exception was refined further by the Supreme Court in *Edelman v. Jordan*, 415 U.S. 651 (1974). There, the Court made clear that the line dividing those suits barred by the Eleventh Amendment from those suits not barred by the Eleventh Amendment is not simply the difference between money damages and equitable relief. *Id.* at 667. Rather, the appropriate dividing line is between suits seeking retroactive relief from suits seeking prospective relief. "The injunction issued in *Ex parte Young* was not totally without effect on the State's revenues." *Id.* Thus, "an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex Parte Young*." *Id.* at 668. Retroactive relief against a State—the type of relief barred by the Eleventh Amendment—is that relief "measured in terms of a monetary loss resulting from a *past* breach of a legal duty on the part of the defendant state officials[,]" regardless of how that relief is fashioned. *Id.* (emphasis added). Prospective relief, on the other hand, includes injunctive relief that bars a state actor from engaging in certain unconstitutional acts or abates ongoing constitutional violations, as well as the "payment of state funds . . . as a necessary consequence of compliance *in the future* with a substantive federal-question determination . . . ." *Id.* at 289 (emphasis added). "[T]he availability of prospective relief of the sort awarded in *Ex Parte Young* gives life to the Supremacy Clause" and is therefore not barred by the Eleventh Amendment. *Green v. Mansour*, 474 U.S. 64, 68 (1985).

The Supreme Court put this distinction to work in *Milliken v. Bradley*, 433 U.S. 267, 289 (1977). In that case, the Court unanimously upheld a decree that ordered the state to pay half of the cost of a remedial education program in order to desegregate Detroit schools even though the decree ran against state officials and contemplated payment from the state treasury. The Court stated:

> The decree to share the future costs of educational components in this case
> fits squarely within the prospective-compliance exception reaffirmed by *Edelman*.

That exception, which had its genesis in *Ex Parte Young*, permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury.  The order challenged here does no more than that.  The decree requires state officials, held responsible for unconstitutional conduct . . . to eliminate a de jure segregated school system. . . .  The educational components, which the District Court ordered into effect *prospectively,* are plainly designed to wipe out continuing conditions of inequality produced by the inherently unequal dual school system long maintained by Detroit. . . .

That the programs are also "compensatory" in nature does not change the fact that they are part of a plan that operates *prospectively* to bring about the delayed benefits of a unitary school system.

*Id.* at 289–90 (internal citations and quotations omitted) (emphasis in original).

Simply put, "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in the judgment)).  The "general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought," *Pennhurst*, 465 U.S. at 107—namely, would the relief abate an ongoing violation or prevent a threatened future violation of federal law?  If the answer to that question is "yes," then the relief is properly characterized as prospective and the Eleventh Amendment poses no bar to a plaintiff's claim.[4]  In making this determination, a court should look to substance over form and be mindful of the fact that "the line between permitted and prohibited suits will often be indistinct." *Papasan v. Allain*, 478 U.S. 265, 278–79 (1986).

---

[4] This same analysis applies to a plaintiff seeking declaratory relief.  *Compare Quern v. Jordan*, 440 U.S. 332 (1979) (permitting non-binding "notice" relief that is ancillary to an injunction validly issued under the *Ex Parte Young* exception) *with Green*, 474 U.S. at 71–74 (holding that declaratory relief is barred by the Eleventh Amendment in the absence of a continuing violation of federal law).

b. <u>Analysis</u>

In this case, the Executive Defendants argue that Plaintiffs' claims will have such a large impact on the state treasury—an impact upwards of $15,000,000,000—that this would result in "an effect that core 11th Amendment jurisprudence prohibits." (Defs.' Reply Br. 4). As explained above, however, the question to be answered in this case is appropriately framed as determining whether Plaintiffs' requested relief is retroactive or prospective in nature. Therefore, at the heart of this Court's Eleventh Amendment analysis is the following question: was the enactment of Chapter 78 a single act that has continuing ill-effects or does the enforcement of Chapter 78 by the Executive Defendants amount to a continuous violation of the Plaintiffs' constitutional rights? *See, e.g.*, *Papasan*, 478 U.S. at 277–78. After examining the nature of Plaintiffs' claims, the Court has determined that the enactment of Chapter 78 was a single act that continues to have negative consequences for the Plaintiffs. As such, any redress sought by the Plaintiffs would be retroactive in nature and is therefore barred by the Eleventh Amendment.

As an initial matter, Plaintiffs' request for relief that seeks either immediate full funding of the state public-employee pension system or monetary damages suffered as a result of the suspension of COLAs are clearly barred by the Eleventh Amendment. Both requests seek to obtain funds withheld in the past.[5] Even if the Defendants' withholding of funds was unlawful, any attempt to rectify this past withholding of funds would be retroactive in nature. This is

---

[5] Plaintiffs attempt to characterize the request for full immediate funding as being prospective in nature by arguing that "Plaintiffs specifically do not seek retroactive relief to make up for the many years during which the State ignored the instructions of the pension funds' actuaries with respect to funding requirements." (Pls.' Br. at 6). To the extent that the phrase "commence immediately the full funding of [the pension funds]" is ambiguous and could be read as seeking only annual payments on a forward going basis, this seeks to compel specific performance of a contract existing between the State and the Plaintiffs. As discussed *infra*, the Court is without jurisdiction to issue such an order.

exactly the type of relief barred by the Supreme Court in *Edelman*.  *See Edelman*, 415 U.S. at 668.

Whether the remaining relief requested by the Plaintiffs—i.e., a declaratory judgment that portions of Chapter 78 are unconstitutional and an injunction prohibiting enforcement of Chapter 78—is prospective in nature presents a tougher question for the Court.  Ultimately, however, enjoining the enforcement of Chapter 78 is nothing more than an indirect way of forcing the State to abide by its obligations as they existed prior to the enactment of Chapter 78.  Therefore, the relief requested by Plaintiffs is, in both substance and practical effect, a request for specific performance of the alleged pre-Chapter 78 contract existing between Plaintiffs and the State of New Jersey.  Under controlling Supreme Court precedent, such relief is not permitted.  *See, e.g.*, *Stewart*, 131 S. Ct. at 1639 (citing *Edelman*, 415 U.S. at 666–67; *In re Ayers*, 123 U.S. 443 (1887)) (The *Ex Parte Young* exception "cannot be used to obtain . . .  an order for specific performance of a State's contract."); *see also Ameritech Corp. v. McCann*, 297 F.3d 582, 587–88 (7th Cir. 2002) ("[A] federal court cannot force the State to perform an alleged contract that would involve the . . . allocation of funds to a specific purpose." (citing *MSA Realty Corp. v. Illinois*, 990 F.2d 288, 295 (7th Cir. 1993))).

In arguing that an injunction prohibiting the Executive Defendants from enforcing Chapter 78 is prospective in nature, Plaintiffs rely most heavily on the Supreme Court's decision in *Papasan*.  There, the Court was presented with a situation in which the unlawful denial of the economic benefit of public school lands more than 100 years earlier resulted in an alleged present-day disparity in school funding.  *Papasan*, 478 U.S. at 267–68.  The *Papasan* plaintiffs' equal protection claim was allowed to proceed because the ongoing constitutional violation fitting within the *Ex Parte Young* exception was characterized as "the unequal distribution by the

State of the benefits of the State's school lands." *Id.* at 282. The Court explained: "It may be that

the current disparity results directly from the same actions in the past that are the subject of the

petitioners' trust claims, but the essence of the equal protection allegation is the *present disparity*

in the distribution of the benefits of state-held assets and *not the past actions* of the State." *Id.*

(internal citations and quotations omitted) (emphasis added). Therefore, according to the Court,

"[a] remedy to eliminate this current disparity, even a remedy that might require the expenditure

of state funds, would ensure compliance *in the future* with a substantive federal-question

determination rather than bestow an award for accrued monetary liability." *Id.* (internal citations

and quotations omitted) (emphasis in original). Plaintiffs' reliance on this case, however, is

misplaced.

Before turning to the plaintiffs' equal protection claim, the Supreme Court in *Papasan*

first considered the claim that the federal grants of land to the State of Mississippi created a

perpetual trust for the benefit of the public schools, with the State acting as trustee. *Id.* at 279.

The plaintiffs alleged that the State and its officials breached their fiduciary obligations in this

role. *Id.* The Court, however, rejected this claim as barred by the Eleventh Amendment. *Id.* at

281. To begin its analysis, the Court accepted, for the sake of argument, the plaintiffs'

contention that a land trust imposed specific fiduciary burdens and obligations on the state and

state officials acting as trustees. *Id.* at 279 (citation omitted). The plaintiffs contended that this

was a continuing obligation placed upon these state actors and therefore actionable under *Ex*

*Parte Young*. The Court, however, reasoned that "[t]he distinction between a continuing

obligation on the part of the trustee and an ongoing liability for past breach of trust is essentially

a formal distinction of the sort we rejected in *Edelman*." *Id.* at 280; *see also Louisiana v. Jumel*,

107 U.S. 711, 723 (1883). In other words, there is "no substantive difference between a not-yet-

extinguished liability for a past breach of trust and the continuing obligation to meet trust responsibilities." *Papasan*, 478 U.S. at 281.

Although Plaintiffs have creatively characterized their claims, in substance they ask this Court to mandate the specific performance of a contract existing between them and the State. Cases such as *Edelman* and *Papasan*, however, recognize that the distinction between liability for a past breach of contract and a continuing obligation to abide by the terms of the contract is a mere formal distinction under the doctrine of *Ex Parte Young*; it cannot serve as a basis for an end-run around a state's sovereign immunity protections. This was explicitly recognized by the Supreme Court in a pre-*Younger* case ignored by all parties in the briefing of this motion.

In *In re Ayers*, 123 U.S. 443 (1887), the Supreme Court held that the Eleventh Amendment bars suits seeking the specific performance of a contract between a private party and a state. There, like here, the *Ayers* plaintiffs alleged that an act of a state legislature impaired the obligation of a contract existing between the state and the plaintiffs. *See id.* at 492–93. The legislation at issue in *Ayers* revoked the ability of plaintiffs to pay state taxes with tax-receivable coupons. After enactment of the statute, plaintiffs sought an order barring state officials from bringing suit in order to recover back taxes, which the tax-payers claimed to have already paid by tendering the tax-receivable coupons. *Id.* at 486. A lower circuit court issued an injunction, but the state officials refused to abide by it and were subsequently imprisoned for contempt of court. *Id.* The state officials then appealed to the United States Supreme Court. In determining whether the imprisonment of state officials was appropriate, the Court addressed the underlying issue—i.e., whether the lower court had the authority to issue a writ of mandamus or whether that order was barred by the Eleventh Amendment.

The Court explained that Eleventh Amendment bars not only direct actions for breach of contract against a state, but it also bars actions seeking to compel specific performance. *Id.* at 502 (quoting *Hagood v. Southern*, 117 U.S. 52 (1886)). "[A] bill, the object of which is by injunction, *indirectly*, to compel the specific performance of the contract, by forbidding all those acts and doings which constitute breaches of the contract, must also, necessarily, be a suit against the State." *Id.* (emphasis added). Even if the state is not a named party, "if the defendants are its officers and agents, through whom alone it can act in doing and refusing to do the things which constitute a breach of its contract, the suit is still, in substance, though not in form, a suit against the State." *Id.* at 503. The Court concluded that

> where the contract is between the individual and the State, no action will lie against the State, and any action founded upon it against defendants who are officers of the State, the object of which is to enforce its specific performance by compelling those things to be done by the defendants which, when done, would constitute a performance by the State, *or to forbid the doing of those things which, if done, would be merely breaches of the contract by the State*, is in substance a suit against the State itself, and equally within the prohibition of the Constitution.

*Id.* at 504 (emphasis added).

The Court reasoned that an "important distinction" exists in regards to contracts between private parties and contracts existing between the state and a private individual. *Id.*

> In the case of contracts between individuals, the remedies for their enforcement or breach, in existence at the time they were entered into, are a part of the agreement itself, and constitute a substantial part of its obligation. That obligation, by virtue of the provision of Article I, § 10, of the Constitution of the United States, cannot be impaired by any subsequent state legislation. Thus, not only the covenants and conditions of the contract are preserved, but also the substance of the original remedies for its enforcement. It is different with contracts between individuals and a State. In respect to these, by virtue of the 11th Amendment to the Constitution, there being no remedy by a suit against the State, the contract is substantially without sanction, except that when arises out of the honor and good faith of the State itself, and these are not subject to coercion. Although the State may, at the inception of the contract, have consented as one of its conditions to subject itself to suit, it may subsequently withdraw that consent and resume its

original immunity, without any violation of the obligation of its contract in the constitutional sense.

*Id.* at 505. To permit otherwise would result in "the course of [a state's] public policy and the administration of [a state's] public affairs . . . be[ing] subject to and controlled by the mandates of judicial tribunals without [the state's] consent, and in favor of individual interests." *Id.* at 504–05 (internal citations omitted).

The rule expressed in *Ayers* was not questioned by the Supreme Court in *Ex Parte Young*. *See* RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 893 (6th ed. 2009); *see also Coeur d'Alene*, 521 U.S. at 278 (Kennedy, J., principal opinion)[6] (stating that *Ayers* was "cited with approval" in *Ex Parte Young*); *MSA Realty Corp.*, 990 F.2d at 294 ("Even after *Ex parte Young* was decided in 1908, the Supreme Court has never approved a lower court order requiring officials of a state to take actions that constitute performance by a state of obligations that are the state's in its political capacity."). As recently as last year, the Court cited *Ayers* with approval for the proposition that the *Ex Parte Young* exception "cannot be used to obtain . . . an order for specific performance of a State's contract." *Stewart*, 131 S. Ct. at 1639 (citing *Edelman*, 415 U.S. at 666–67; *In re Ayers*, 123 U.S. 443).

The line separating cases barred by the Eleventh Amendment from those not barred by the Eleventh Amendment in this area has not always been clear. For example, one case seemingly at odds with *Ayers* is *Ga. R.R. & Banking Co. v. Redwine*, 342 U.S. 299 (1952). In *Redwine*, the Court was presented with a situation in which a railroad company was incorporated by a special act of the state legislature that included in it a provision exempting the company from state taxation. *Id.* at 300. The state later tried to nullify this tax exempt status and the

---

[6] Justice Kennedy wrote the majority opinion in *Coeur d'Alene*. There are portions of his opinion, however, that were joined only by Chief Justice Rehnquist. Adopting the terminology of Justice O'Connor's concurrence, the term "principal opinion" will refer to those portions of Justice Kennedy's opinion joined only by Chief Justice Rehnquist, while the term "majority opinion" will refer to those portions joined by a majority of the court.

railroad company brought suit claiming that this violated the Contracts Clause. *Id.* The Court

held that an injunction preventing the state revenue commissioner from initiating tax

enforcement proceedings against the railroad was not barred by the Eleventh Amendment. *Id.* at

305. *Ayers* was distinguished, and not overruled, on the grounds that in *Redwine* the plaintiff

sought "to enjoin [the commissioner] from a threatened and allegedly unconstitutional invasion

of its property," while in *Ayers* the plaintiff "had not alleged that officers threatened to tax its

property in violation of its constitutional rights." *Id.* Put somewhat differently, in *Ayers* it was

the legislation itself that revoked the utility of the tax-receivable coupons, while in *Redwine* the

legislation merely empowered the state tax commissioner to levy taxes and did not, on its own

accord, impair any obligations of contract. An additional act—i.e., the assessment of taxes or an

enforcement action by the state tax commissioner—was necessary to create a constitutional

violation in *Redwine*, but that had not yet occurred. Therefore, plaintiff's claims in *Redwine*

could be appropriately characterized as prospective. Here, it is the legislation (i.e., Chapter 78),

not the independent acts of the Executive Defendants, that is alleged to be unconstitutional. This

distinction is subtle but important.[7]

In applying the rule expressed in *Ayers*, "two classes of cases have appeared" in which

"differing views have been presented." *Pennoyer v. McConnaughy*, 140 U.S. 1, 9–10 (1891).

"The first class is where the suit is brought against the officers of the State, as representing the

State's action and liability, thus making it, though not a party to the record, the real party against

---

[7] Justice Kennedy alluded to this distinction in his principal opinion in *Coeur d'Alene*. Although a majority refused to join this portion of Justice Kennedy's opinion, he explained early cases leading up to *Ex Parte Young* as being based on a theory of common-law tort. *See Coeur d'Alene*, 521 U.S. at 273 (Kennedy, J., principal opinion). "Under this line of reasoning, a state official who committed a common-law tort was said to have been 'stripped' of his official or representative character." *Id.* at 272–73 (citing *Ex Parte Young*, 209 U.S. at 159–60; *Poindexter v. Greenhow*, 114 U.S. 270, 288 (1885)). Accordingly, "[p]art of the significance of *Young,* in this respect, lies in its treatment of a threatened suit by an official to enforce an unconstitutional state law as if it were a common-law tort." *Id.* By this reading, importance is placed on the act of enforcement, separate and apart from the constitutionality of the underlying legislation.

which the judgment will so operate as to compel it to specifically perform its contracts." *Id.* at 10 (citations omitted). This is the type of case to which the rule announced in *Ayers* applies. In such a case, "affirmative relief w[ill] not be granted against a State officer, by ordering him to do and perform acts forbidden by the law of his State, even though such law might be unconstitutional." *Id.* at 16 (discussing *Cunningham v. Mason & Brunswick R.R.*, 109 U.S. 453, 454 (1883)); *see also Ex Parte Young*, 209 U.S. at 151 (distinguishing *Ayers* and *Hagood* on the grounds that, "[t]he things required to be done by the actual defendants were the very things that when done would constitute a performance of the alleged contract by the State"); *Graham v. Folsom*, 200 U.S 248, 254 (1906) ("[T]he relief asked against the officers is 'affirmative official action,' which the political body of which they are the mere servants has forbidden them to exercise, and it is not competent for a court to compel them to exercise, because of the immunity of the State from suit under the Constitution of the United States."). This is true no matter how creatively a plaintiff's claims are characterized. In *Ayers*, for example, the lower court framed its order as though it was preventing the state officials from undertaking certain actions (i.e., the relief was framed as restrictive, not affirmative). The Supreme Court, however, looked at the substance of the claim and viewed it as compelling the affirmative relief of specific performance.

In contrast, the second type of case is where suit is brought against defendants, "claiming to act as officers of the State, and under the color of an unconstitutional statute, commit acts of wrong and injury to the rights and property of the plaintiff acquired under a contract with the State." *Pennoyer*, 140 U.S. at 10 (citations omitted). *Ex Parte Young* applies with full force in this type of situation, where the Defendants' actions, "*considered apart from the official authority alleged as its justification*, and as the personal act of the individual defendant, constituted a violation of right for which the plaintiff was entitled to a remedy at law or in equity

14

against the wrongdoer in his individual character." *In re Ayers*, 123 U.S. at 502 (emphasis added).  Put in the context of the retroactive/prospective dichotomy, the distinction is that between legislation which itself amounts to a breach by anticipatory repudiation—thus making the relief of specific performance retroactive in nature—and legislation that merely grants a state official the authority to undertake certain acts that *in the future* will violate federal law.

To be sure, the line separating these two types of cases is often murky.  *See, e.g.*, *Faust v. S.C. State Highway Dep't*, 721 F.2d 934, 957 (4th Cir. 1983) (referring to this distinction as "unsatisfactory and conceptually unruly").  "As in most areas of the law, the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night."  *Edelman*, 415 U.S. at 667; *see also* *Papasan*, 478 U.S. at 278 ("[T]he line between permitted and prohibited suits will often be indistinct.").  This Court, however, must look to the substance of Plaintiffs' requested relief, not to how creatively their claims are pleaded.  *See Papasan*, 478 U.S. at 279 ("In discerning on which side of the line a particular case falls, we look to the substance rather than to the form of the relief sought . . . ."); *see also In re Ayers*, 123 U.S. at 503 ("[I]f the defendants are its officers and agents, through whom alone it can act in doing and refusing to do the things which constitute a breach of its contract, the suit is still, *in substance, though not in form*, a suit against the State." (emphasis added)).  Plaintiff cannot avoid the rule expressed in *Ayers* simply by pleading their claims against the Executive Defendant as though their actions constitute a continuous constitutional violation or a threatened future violation.  *See, e.g.*, *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla.*, 177 F.3d 1212, 1225 (11th Cir. 1999) (rejecting "various theories under which the individual [sovereign officials] must pay [plaintiff] forty percent of MIB's net revenues" as a "thinly-disguised attempt by [plaintiff] to obtain specific performance

15

of the Tribe's obligations under the Agreement, which allocates forty percent of MIB's net revenues to [plaintiff].").

As the United States Court of Appeals for the Seventh Circuit recognized in a case similar to the case at bar, Plaintiffs' arguments have superficial appeal. *See MSA Realty Corp. v. Illinois*, 990 F.2d 288, 292 (7th Cir. 1993).[8]  However, as the *MSA Realty* court also recognized: "Closer scrutiny shows that Plaintiff's claim is wholly unlike those approved in [prior cases]. [Plaintiff] can obtain the relief it wants only through an order directing the payment of certain funds out of the state treasury to [a third party] for the ultimate benefit of [the Plaintiff]." *Id.* Here, Plaintiffs are attempting to do the same thing as the plaintiffs in *MSA Realty*.  The only difference in this case is that Plaintiffs seek the payment of funds indirectly by an order that essentially reinstates the status quo existing prior to the enactment of Chapter 78.  "To interpret *Young* to permit a federal court-action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle . . . that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction." *Coeur d'Alene*, 521 U.S. at 270 (majority opinion).  This Court must be mindful that "[t]he real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading." *Id.*  Unlike a case such a *Milliken* or *Papasan*, the gravamen of Plaintiffs' Amended Complaint is not "to vindicate the plaintiffs' civil liberties," but it is instead "to establish ownership over state resources or funds." *Id.* at 279 (Kennedy, J., principal opinion).

---

[8] In that case plaintiff "cast[]its request for relief as prospective only: seeking to have the state officials cease their unconstitutional interference with [plaintiff's] contract with the Village of Buffalo Grove by returning this year and in the future the full 5 percent state sales tax increment to the village for payment of debt service on the bonds held by [plaintiff]." *Id.* at 292.  The court, however, looked past the form of plaintiff's request and found that "[a]lthough [plaintiff] alleges interference by the named state officials with its private contract with the Village of Buffalo Grove; what it seeks in actuality is the performance of the state's alleged promise to the financing districts that induced [plaintiff] to enter into the contract with the Village of Buffalo Grove . . . ." *Id.* at 293.

The Supreme Court has never sanctioned a lower court order in which a state was required "to take on such open-ended and potentially burdensome obligations." *See Pennhurst*, 451 U.S. at 29.  In several cases arising in the aftermath of the Civil War, for example, the Court held that both states and their officials were immune from suits seeking to enforce the payment of state-issued bonds.  *See, e.g.*, *Hans*, 134 U.S. 1 (applying rule to state's own citizens); *New Hampshire v. Louisiana*, 108 U.S. 76 (1883) (applying rule to other states); *Principality of Monaco v. Mississippi*, 292 U.S. 313 (1934) (applying rule to foreign countries).

One such case was *Louisiana v. Jumel*, 107 U.S. 711 (1883).  There, plaintiffs attempted to have a constitutional amendment to the Louisiana State Constitution declared null and void because it lowered the rate of interest payable on previously-issued state bonds.  *Id.* at 716–17.  In rejecting federal court jurisdiction over this claim, the Court stated that it had "no doubt" that Louisiana intended to enter a binding contract based upon the previously stated interest rate.  *Id.* at 719.  Regardless, the Court held that "there is no way in which the State, in its capacity as an organized political community, can be brought before any court of the State, or of the United States, to answer a suit in the name of these holders to obtain such a judgment."  *Id.* at 720.  A private litigant cannot, "either by mandamus or injunction, against the State in its political capacity, . . . compel it to do what it has agreed should be done, but which it refuses to do."  *Id.*  The Court characterized this type of suit as an action seeking "to compel, by judicial process, the officers of the State to enforce the provisions of the act, when the State, by an amendment to its Constitution, has undertaken to prohibit them from doing so, and when the court, if it requires an officer to proceed, cannot protect him with a judgment to which the State is a party."  *Id.* at 720.  Even though "the money was raised to pay this particular class of debts, and the agreement was that it should not be used for any other purpose, . . . the State has undertaken to appropriate it to

17

defray the expenses of the government." *Id.* at 721.  Regardless of whether this violated the

plaintiffs' rights, the State and its officials were immune from suit because "if [the State] could

be sued, [it] might perhaps be made to set aside its wrongful appropriation of the money already

in hand, and raise more by taxation, if necessary." *Id.* at 721.  Like the Plaintiffs in this case, the

*Jumel* plaintiffs attempted to characterize the relief requested as though it did not directly compel

the state to affirmatively abide by pre-existing, but superseded, state law.  *See id.* at 721.  This,

however, could not insulate the plaintiffs from the reach of the Eleventh Amendment.

        In sum, the Court concludes that the relief Plaintiffs seek—i.e., a permanent injunction

preventing Executive Defendants from "administering, enforcing or otherwise implementing"

portions of Chapter 78—will have only one effect: the resumption of the status quo existing prior

to the enactment of this legislation.  This would result, for all practical purposes, in either the

specific performance of the contract allegedly existing between Plaintiffs and the State of New

Jersey or an order compelling the State to abide by what it has agreed to do in its capacity as an

"organized political community."  The Eleventh Amendment bars this Court from having

jurisdiction over such a claim.  *See, e.g.*, *Barry v. Fordice*, 814 F. Supp. 511, 515–18 (S.D. Miss.

1992); *cf. Coeur d'Alene*, 521 U.S. at 291 (O'Connor, J., concurring in part and concurring in the

judgment) (Because "a ruling in the [plaintiff's] favor, *in practical effect*, would be

indistinguishable from an order granting the [plaintiff] title to submerged lands, the *Young*

exception to the Eleventh Amendment's bar is not properly invoked here." (emphasis added)).

        Likewise, Plaintiffs' request for a declaratory judgment must also be rejected.  Such relief

is not ancillary to a valid injunction and therefore is barred by the Supreme Court's decision in

*Green*, 474 U.S. at 71–72.  A declaratory judgment in this case would have res judicata effect,

which would, in substance, be nearly identical to an injunction prohibiting enforcement of the

statute, *see Samuels v. Mackell*, 401 U.S. 66 (1971), or have "much the same effect as a full-fledged award of damages or restitution by the federal court, the . . . kinds of relief being of course prohibited by the Eleventh Amendment," *Green*, 471 U.S. at 73.

There is one loose end that this Court must address. Plaintiffs contend in the Amended Complaint that Chapter 78's requirement that certain Plaintiffs increase their contributions to the pension and medical benefit accounts is unconstitutional. In substance and effect, however, remedying this alleged wrong would indirectly force upon the State of New Jersey and its officials an obligation that, as discussed above, this Court does not have jurisdiction to compel. As Plaintiffs admit in the Amended Complaint, employee and state contributions bear an inverse relationship such that "the increased employee contributions will not serve to increase the pension funds' assets but will, instead, primarily serve to reduce the State's obligations." (Am. Compl. ¶ 103). Thus, enjoining the State from enforcing the increased contribution to retirement or medical accounts that some Plaintiffs must now pay under Chapter 78 is just one more indirect way of reaching a result that this Court is without authority to mandate. *Cf. North Carolina v. Temple*, 134 U.S. 22 (1890) (refusing to compel state to raise taxes in order to pay interest due on state bonds in accordance with prior state statute).

Ultimately, the *Ex Parte Young* exception is not applicable where "although nominally against individual officers, the state is the real, substantial party in interest and the suit is in fact against the state." *MCI Telecomm. Corp. v. Bell Atlantic-Pa.*, 271 F.3d 491, 506 (3d Cir. 2001) (citing *Pennhurst*, 465 U.S. at 101). This is such a case.

### III. CONCLUSION

For the foregoing reasons, Executive Defendants' Motion to Dismiss for lack of subject matter jurisdiction will be granted. Because this Court is without jurisdiction, the other arguments raised by the parties need not be addressed. An appropriate Order will follow.


                                               */s/ Anne E. Thompson*
                                               ANNE E. THOMPSON, U.S.D.J.

Date: March 5, 2012